## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.

**FILED**

Dec 12 2016, 6:33 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Tula Kavadias
Crown Point, Indiana

ATTORNEY FOR APPELLEE

Harold Abrahamson
Abrahamson, Reed & Bilse
Hammond, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Carolyn F. Brundage,

*Appellant/Cross-Appellee/Respondent,*

*v.*

Brian R. Brundage,

*Appellee/Cross-Appellant/Petitioner.*

December 12, 2016

Court of Appeals Case No.
45A04-1603-DR-506

Appeal from the Lake Circuit Court
The Honorable George C. Paras, Judge

Trial Court Cause No. 45C01-1401-DR-43

**Bradford, Judge.**

# Case Summary

[1] Appellant/Cross-Appellee/Respondent Carolyn Brundage ("Mother") and Appellee/Cross-Appellant/Petitioner Brian Brundage ("Father") married in 1998 and had two children, A.B., born in 2001, and B.B., born in 2008 (collectively, "the Children"). In 2013, Mother began an extramarital affair, of which she informed Father in early 2014. Mother also informed Father that she wanted to separate from him, and Father petitioned for dissolution of the parties' marriage. Mother soon noticed that the Children's attitude toward her had changed, with A.B. refusing to speak to or greet her at a hearing on a provisional order.

[2] Approximately one week after Father petitioned for dissolution, the trial court issued a provisional order, which, *inter alia*, ordered Father to pay $1000 per month to Mother in provisional maintenance. Over the next few months, the parties and Children participated in counseling. Both A.B. and B.B. indicated during counseling sessions that they hated Mother. In November of 2014, the provisional order was amended to reflect a hiatus in visitation involving A.B. and Mother. Also around this time, Father stopped making his monthly provisional maintenance payments.

[3] Following a final evidentiary hearing, the trial court issued its dissolution order. *Inter alia*, the trial court (1) awarded primary physical custody of the Children to Father, (2) ordered that Mother pay Father $119 per week in child support, (3) purported to divide the marital estate equally while acknowledging the difficulty

of assigning values to many assets, and (4) ordered that Father pay $25,000 in attorney's fees directly to Mother's attorney. The trial court's order did not address Father's failure to pay provisional maintenance for fourteen months.

[4] As restated, Mother contends that the trial court abused its discretion in awarding primary physical custody of the Children to Father, determining child support, dividing the marital estate and valuing certain marital assets, and failing to award provisional arrears owed by Father to Mother. Father cross-appeals, contending that the trial court abused its discretion in ordering him to pay $25,000 in attorney's fees directly to Mother's attorney. We affirm in part, reverse in part, and remand with instructions.

## Facts and Procedural History

[5] Mother and Father were married on September 5, 1998, and two children were born of the marriage: A.B., born in June of 2001, and B.B., born in May of 2008. In 2013, Mother began an affair with Brian Jones, the Children's football coach. On or about January 3 to January 5, 2014, when Mother informed Father of the affair, Father told the Children that "mom picked a new dad for you." Tr. p. 780.

[6] On January 21, 2014, Mother told Father that she wanted to physically separate from him. Father, who had been encouraging Mother to stay in the marriage, called the Children into the bedroom, telephoned the police, and told them that Mother was beating him. When police arrived, Father had a "gaping gash" on

his head that Mother had not inflicted. Tr. p. 790. Although police did not arrest Mother, they told her that she should leave the marital residence.

[7] On January 22, 2014, Mother returned to the martial residence to retrieve some personal items and noticed that all of her jewelry was gone. Also that day, Father filed his verified petition for dissolution and motion for provisional order and obtained an ex parte order for protection against Mother. Mother was out of the marital residence for approximately one week pursuant to the order of protection. When Mother was able to return to the marital residence, she noticed that the Children's attitude and treatment of her had changed significantly.

[8] Following a hearing on January 29, 2014, the trial court issued a provisional order providing that: (1) neither party conceal, sell, or otherwise dispose of joint property or molest or disturb the peace of the other; (2) neither party expose the Children to a non-relative person with which the party was having or sought to have an intimate relationship; (3) the parties shall have joint legal and physical custody of the Children with each staying with them 50% of the time at the marital residence; (4) Father pay Mother $1000.00 per month as maintenance; (5) Mother was to receive a separate bedroom at the marital residence; and (6) the parties and Children begin counseling.

[9] After one weekend when Father had possession of the marital residence for visitation, the parties' housekeeper reported for work to find that one shoe was missing from each of Mother's pairs of shoes and that both shoes from the most

expensive pairs were missing. When Mother returned to the marital residence under the terms of the provisional order, the Children would not eat the food she prepared for them, telling her that her hands were "dirty." Tr. p. 814.

[10] On May 3, 2014, Dr. Jan Elliot, Ph.D., conducted a court-ordered counseling session with Mother, A.B., and B.B. Dr. Elliot met first with Mother and when A.B. was introduced, he refused to acknowledge Mother at first and then screamed, "I hate you; you're not a good mother." Tr. p. 418. The session was not productive and Dr. Elliot concluded that A.B. was being negatively influenced by Father. When Dr. Elliot attempted to have B.B. brought in to calm A.B., B.B. entered with his middle finger raised at Mother screaming "I hate you" repeatedly. Tr. p. 426. Dr. Elliot concluded that Father was negatively influencing the Children.

[11] In June of 2014, in response to reports that Mother and her relatives were abusing A.B., a petition alleging the Children to be children in need of services ("CHINS") was filed. During the CHINS proceeding, psychologist Dr. Warren Ugent recommended that there be a hiatus in A.B. and Mother's visitation. Father was awarded temporary custody of A.B., and, after a few supervised visitations with Mother, DCS determined that there should be no further visitation with Mother. On or about November 7, 2014, the provisional order was amended to reflect the status quo with respect to A.B. and Mother's visitation situation.

[12] Meanwhile, in February of 2014, Father had become involved with a woman named Emily Stewart ("Emily Stewart #1"). Father spent tens of thousands of dollars on Emily Stewart #1, stayed with her in an apartment at his business, and brought her into the Children's lives in June of 2014. When the relationship with Emily Stewart #1 ended, she left with a large amount of Father's money.

[13] While attempting to locate Emily Stewart #1, Father found another woman named Emily Stewart ("Emily Stewart #2") on Facebook and began correspondence. In February of 2015, Father flew to Australia to meet Emily Stewart #2, leaving the Children with their nanny. Father returned from Australia with Emily Stewart #2, and she moved into Father's home. On April 25, 2015, Father and Emily Stewart #2 were married in Las Vegas, a union that was soon annulled because Father and Mother were still legally married at the time. Meanwhile, as of October 2014, Father ceased paying his $1000 per month maintenance to Mother and accumulated a $14,000 arrearage as of the final hearing.

[14] A final hearing on the dissolution was held over five days beginning on December 18, 2015. On February 9, 2016, the trial court issued its dissolution decree ("the Decree"). The Decree provided, in part, as follows:

9. … The evidence showed that Mother's relationship with the children of the marriage is strained, and regarding the older child [A.B.], the relationship is extremely dysfunctional to the point of being toxic and poisonous. The evidence indicated that Father has directly and

purposefully undermined the children's relationship with Mother. While this action was pending, a CHINS action was initiated regarding the parties' children; that action was eventually dismissed as the court believed the Brundages were capable of securing the necessary services without the intervention of the child welfare authorities. Regardless of the source of the extreme tension, Mother's relationship with the children at the present time is so unworkable as to render it impossible for Mother to have physical custody of the children.

10. The Court has taken into account the statutory factors and has considered what is in the best interests of the children in determining the issue of custody and parenting time.

11. Both parents are fit and proper persons to have care and custody of the parties' minor children.

….

14. While this action was pending, Father had a girlfriend outside of the marriage named Emily Stewart, whom the Court will refer to as Emily Stewart #1. The evidence showed that he provided housing for her through the parties' business, and attempted to pass her off as an employee of the company. While this action was pending, Father entrusted Ms. Stewart #1 with approximately $250,000 of marital funds by putting the cash in accounts in her name. Ms. Stewart #1 absconded with the funds and neither she nor the funds have been located.

15. In his attempts to locate Ms. Stewart #1 and the missing funds, Father initiated an internet search and discovered a woman with the same name living in Australia. Father traveled to Australia to meet her, and brought her back to the U.S. to live with him. This was not the same Emily Stewart who took the $250,000 in marital funds. Father expended marital funds in pursuing Emily Stewart #2.

16. Father traveled to Las Vegas, Nevada, with Ms[.] Stewart #2 in April 2015, and married her there, before the dissolution of his marriage to Mother was finalized. Father and Ms. Stewart #2 had that marriage annulled in

Nevada in July 2015. Father testified that he was unaware that there is a law against marrying another spouse while still being married to the current spouse.

17. Both parties posted various lascivious photos of themselves with their new significant others on Facebook while this action was pending, which postings fanned the flames of the children's alienation and other emotional and psychological issues.

18. The Court notes that Father was a less than credible witness on numerous points of testimony. The Court also notes that Father appears to be an accomplished manipulator of facts and situations.

91. The parties have a variety of business interests, but Father's primary business appears to be Intercon Solutions, Inc., in which he is a 50% owner. Father contends that this business is bankrupt and that he is unemployed and without income. The testimony indicated that Father engaged in a variety of questionable and possibly illegal practices that resulted in draining the assets and value from Intercon Solutions, and diverting them to himself.

20. While this action was pending, at the same time that Father contends that he is without income and that Intercon [Solutions] is broke, Father incorporated a new company, Envirogreen Processing, LLC, which is headquartered at Father's current residential address. Father listed himself as CEO and Ms. Stewart #2 as the owner of this company.

21. Ms. Stewart #2 is currently pregnant.

22. Both parties work in their various businesses and derive income from those businesses. Father claims to be unemployed and is collecting unemployment benefits from the State of Illinois in the amount of $580 per week. Father claimed income of $92,000 for the year 2015; however, expert witness William Condon examined business records and testified that Father was more likely earning an average in excess of $1,000,000 annually for the

last three years. Mother works at her businesses mostly on-line, with the testimony indicating that she earns approximately $50,000.00 annually from Oak Street Social. There was no evidence as to income from her other businesses.

23. The evidence was fairly indeterminate and contradictory as to what income should be attributed to each party. Accordingly the Court has based child support on the income levels shown on the most recent tax returns filed by the parents, with Father having weekly income of $1,923.08 and Mother having weekly income of $961.54. Mother should be ordered to pay to Father the sum of $119.00 each week for the support of the parties' minor children. Said child support is in accordance with the Indiana Child Support Guidelines. Said child support shall be paid by way of an Income Withholding Order through the State Central Unit, PO. Box 6219, Indianapolis, Indiana 46206-6219. Father shall be responsible for the first $1,400.88 annually in non-covered medical expenses for the children and Mother shall be responsible for 31.86 % of such expenses in excess of that amount. Father shall keep said children covered by health insurance through his employer.

24. The parties have acquired various assets, both real and personal, during the course of the marriage, and said assets should be divided equitably between the parties.

25. The parties are the owners of real estate consisting of the marital residence located at 1316 Inverness Lane in Schererville, Indiana. Said real estate has an appraised value of $445,000.00, and there are no outstanding mortgages or liens against said property. Mother should be awarded the parties' entire interest in said real estate. Mother shall be responsible for payment of the taxes, insurance, utilities, maintenance and all other debts and obligations arising from the use and ownership thereof, and shall hold Father harmless therefrom.

27. In addition to the house on Inverness Lane, Father may have an ownership interest in the house he moved into while this action was pending, which is located at 724 Royal Dublin Lane in Dyer, Indiana. Father denies that he owns the house, and claims that it is owned by a relative of his, but the evidence showed that Father has spent a large sum of money for remodeling and improvements to that real estate. There is no evidence before the Court as to the value of that house. Father should be awarded any ownership interest he may have in that real estate and hold Mother harmless on any obligations in connection with it.

28. The parties have acquired the following items of personal property during the course of the marriage:
    a. various items of furniture, appliances and household goods located at the marital residence, valued at approximately $225,000.00.
    b. 2008 Lexus LS 460, valued at approximately $42,000.00; Mother has possession of this vehicle.
    c. 2013 Land Rover, currently in Father's possession.
    d. 2011 Kia automobile, currently in Father's possession.
    e. 2008 Porsche 911, valued at approximately $42,000.00; proceeds from the sale of this vehicle were divided equally between the parties while this action was pending.
    f. Lexus LFA, which was sold while this action was pending; Father received $175,000 from the sale of this vehicle.
    g. Lexus 600, currently in father's possession
    h. 2009 Cadillac Escalade, currently in Father's possession
    i. Polaris ATV XS, currently in Father's possession.
    j. TCF Bank checking account #5670, balance $6,551
    k. TCF Bank savings account #2977, balance $505.
    l. American Express savings, #4486, balance $524

m.  Grow Financial FCU savings, #3985-1, balance $6.00

n.  Grow Financial FCU money market #3985-10, balance $982

o.  Grow Financial FCU savings #5037-1, balance $6.00

p.  Grown Financial FCU money market #5037-10, balance $982.

q.  Fidelity, #1692, balance unknown

r.  MetLife #2653, balance unknown

s.  TD Ameritrade, #5322, balance $6,563.

t.  New York Life whole life policy #8823 on Father, cash value $10,762.

u.  New York Life term life policy #2123 on Father, no cash value

v.  New York Life whole life policy #0039 on Father, cash value $6,549.

w.  New York Life whole life #8572 for son [A.B.], cash value $19,349

x.  New York Life whole life #8555 for son [B.B.], cash value $19,629

y.  ING term life policy #4066 on Father, no cash value

z.  New York Life whole life policy #8192 on Mother, cash value unknown

aa.  New York Life term life policy #3564 on Mother, no cash value.

ab.  Mother's jewelry collection, estimated value of $1,000,000.

ac.  Father's jewelry collection, insured for $344,003

ad.  Mother's stamp collection

ae.  Mother's coin collection

af.  Father's sports memorabilia collection

ag.  Intercom Solutions IRA #6692, balance $106,677.

ah.  Father's gun collection

ai.  Gold bullion, value unknown, in Father's possession.

29. Additionally, the parties hold a TCF Bank savings account #0392, balance $551, for the benefit of son [A.B.], and a TCF Bank savings account #1818, balance $500, for the benefit of son [B.B.]. It is the desire of the parties that these accounts continue to be held for the parties' sons and the Court concurs in this.

30. The Court finds that the two whole life insurance policies designated for the benefit of the parties' children continue to be maintained for the children's benefit.

31. The parties expressed their desire that the sports memorabilia collection be set aside for and held in trust for the parties' children, and the Court concurs in this; said collection shall be held in trust by Father for the benefit of [A.B.] and [B.B.].

32. Mother also had an extensive and valuable shoe collection during the marriage. When Father had Mother removed from the marital residence by way of an action for a protective order, he took one shoe of each pair and destroyed them, leaving the collection valueless and forcing Mother to purchase new shoes. When Mother returned to the residence she discovered that Father also destroyed much of Mother's clothing and took, hid or disposed of Mother's jewelry. While Father denies knowing the whereabouts of the jewelry, witnesses testified to having seen it in his possession since the time it disappeared; Father has also continued to pay the premiums on the insurance policy covering the jewelry.

33. Other than Intercon Solutions, the Court finds it impossible based on the evidence presented to quantify the values of the parties' business interests; likewise, no cogent values were presented for many of the personal property items, such as the various collections.

    ….

35. William Condon, a business appraiser, testified that in his opinion Intercon Solutions has a fair market value of $2,200,000, of which Father owns a half interest. Father

claims that he is liable for Intercon [Solutions] company debt in the amount of $823,511.

36. The Court heard extensive evidence from multiple witnesses of Father's actions in diverting funds due to the Intercon [Solutions] company to payment of his personal debts and expenses, and leaving the company unpaid. Testimony also showed that Intercon [Solutions] employees went unpaid or were paid late while Intercon [Solutions] receivables were diverted from the company.

37. The Court is finding it impossible to properly value the parties' business interests. The Court does note that both parties appeared to live well on the funds generated by said business interests[.]

38. The Court finds ample evidence that Father dissipated marital assets in numerous ways, by diverting company assets and bankrupting the business, by secreting funds with his former girlfriend who absconded with the marital money, by spending funds to travel to Australia to meet his current girlfriend, by purposely destroying Mother's personal property and by removing and secreting high value personal property from the marital residence, specifically jewelry Mother asserts was worth in excess of $1,000,000. The Court must take into consideration said dissipation in dividing the marital assets.

....

43. The parties have various debts outstanding from the marriage, but the remaining debts appear to be business debts or automobile loan balances. Business debts and obligations shall be the responsibility of the party who is awarded that business interest. Likewise, automobile loan obligations shall be the responsibility of the party who is awarded the encumbered vehicle.

....

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that:

1. The marriage between the parties herein is hereby dissolved.

2. Mother and Father are hereby awarded joint legal custody of the parties' two children, with Father having primary physical custody of both children. Mother is hereby awarded parenting time with said minor children at times and places befitting the relationship she has with each of the children. Mother is to have parenting time in accordance with the Indiana Parenting Time Guidelines with the parties' younger son [B.B.]. The parties are ordered to continue therapy and counseling for the parties' older son [A.B.] toward the goal of reuniting [A.B.] with Mother and normalizing their relationship. Mother shall have parenting time with [A.B.] at such times, places and durations as deemed beneficial by the therapist or counselor guiding the effort to reunite them. The parties shall have 30 days to stipulate on the record to a therapist or counselor or the Court will appoint such a professional. The issue of Mother's parenting time with [A.B.] will be revisited by the Court as the reunification effort progresses.

3. Mother … is hereby ordered to pay to Father … the sum of $119.00 each week for the support of the parties' minor children. Said child support is in accordance with the Indiana Child Support Guidelines. Said child support shall be paid by way of an Income Withholding Order through the State Central Unit, PO. Box 6219, Indianapolis, Indiana 46206-6219. Father shall be responsible for the first $1,400.88 annually in non-covered medical expenses for the children and Mother shall be responsible for 31.86% of such expenses in excess of that amount. Father shall keep said children covered by health insurance through his employer.

4. The Court finds that the child Mother gave birth to while this action was pending is not a child of the marriage, that Father is not the father of said child and that Father has no obligations toward or rights in connection with said child. The Court further finds that the evidence indicates that the father of that child is Brian Jones. As it is not the intent of the Court to leave that child legally fatherless, Mother is

instructed to take all necessary steps to establish paternity and ensure that the biological father takes legal responsibility to support said child.

5. Mother … is hereby awarded the parties' entire interest in the real estate located at 1316 Inverness Lane in Schererville, Indiana, 46375. Mother shall be responsible for payment of the taxes, insurance, utilities, maintenance and all other debts and obligations arising from the use and ownership thereof, and shall hold Father harmless therefrom.

6. Father is hereby awarded any ownership interest he may have in the real estate located at 724 Royal Dublin Lane in Dyer, Indiana, and hold Mother harmless on any obligations in connection with it.

7. Father … is hereby awarded as his own individual property the following of the parties' personal assets:
   a. the furniture, appliances and household goods currently in Father's possession.
   b. Father's clothing, jewelry and personal effects.
   c. 2013 Land Rover, currently in Father's possession.
   d. 2011 Kia automobile, currently in Father's possession.
   e. Lexus 600, currently in father's possession
   f. 2009 Cadillac Escalade, currently in Father's possession
   g. Polaris ATV XS, currently in Father's possession.
   h. Intercon Solutions, Inc. 50% share Father's name
   i. Smashmouth LLC, 99% share in Father's name
   j. Brian Brundage Designs, 100% share in Father's name
   k. Worldwide Career Management, 100% share in Father's name
   l. NWI Properties Inc., 100% share in Father's name
   m. Greening Tomorrow, 100% share in Father's name
   n. Intercon Web Marketing, 100% share in Father's name

o. Downtown Investments & Management, LLC, 100% share in Father's name

p. New York Life whole life policy #8823 on Father, cash value $10,762.

q. New York Life term life policy #2123 on Father, no cash value

r. New York Life whole life policy #0039 on Father, cash value $6,549.

s. ING term life policy #4066 on Father, no cash value

t. Father's gun collection

u. Gold bullion, value unknown, in Father's possession.

8. Mother … is hereby awarded as her own individual property the following of the parties' personal assets:

a. the furniture, appliances and household goods currently in Mother's possession.

b. Mother's clothing, jewelry and personal effects that remain in Mother's possession.

c. 2008 Lexus LS 460, valued at approximately $42,000.00.

d. Pretty City, Inc., 100% share in Mother's name

e. Chartee's, 100% share in Mother's name

f. Beauty Bloggers Association, 100% share in Mother's name

g. Chicago Beauty, 100% share in Mother's name

h. Tampa Bay Beauty, 100% share in Mother's name.

i. Oak Street Social, 50% share in Mother's name.

j. New York Life whole life policy #8192 on Mother, cash value unknown

k. New York Life term life policy #3564 on Mother, no cash value.

l. Mother's stamp collection

m. Mother's coin collection

9. The following bank and investment accounts are to be liquidated and the proceeds divided equally between the parties:

a. TCF Bank checking account #5670, balance $6,551
b. TCF Bank savings account #2977, balance $505.
c. American Express savings, #4486, balance $524
d. Grow Financial FCU savings, #3985-1, balance $6.00
e. Grow Financial FCU money market #3985-10, balance $982
f. Grow Financial FCU savings #5037-1, balance $6.00
g. Grown Financial FCU money market #5037-10, balance $982.
h. Fidelity, #1692, balance unknown
i. MetLife #2653, balance unknown
j. TD Ameritrade, #5322, balance $6,563.
k. Intercon Solutions IRA #6692, balance $106,677.

10. The parties shall continue to hold the TCF Bank savings account #0392, balance $551, for the benefit of son [A.B.], the TCF Bank savings account #181 8, balance $500, for the benefit of son [B.B.], the New York Life whole life policy #8572 for son [A.B.], cash value $19,349 and the New York Life whole life policy #8555 for son [B.B.], cash value $19,629. Additionally, Father shall hold in trust for the benefit of the parties' sons the sports memorabilia collection.

11. Father … is hereby ordered to return to Mother … her jewelry and other personal effects that Father removed from the marital residence.

12. The parties have various debts outstanding from the marriage, but the remaining debts appear to be business debts or automobile loan balances. Business debts and obligations shall be the responsibility of the party who is awarded that business interest. Likewise, automobile loan obligations shall be the responsibility of the party who is awarded the encumbered vehicle.

13. Each party should assume and be responsible for any and all debts incurred by him or her individually while this

action was pending, and shall hold the other party harmless therefrom.

14. The parties herein are hereby ordered to execute and deliver all papers and documents necessary to effectuate the above provisions within twenty (20) days of this Decree.

15. Father … is hereby ordered to pay Mother's additional attorney fees incurred herein in the amount of $25,000.00; one-half (1/2) of said sum shall be due within thirty (30) days, and the balance shall be due within sixty (60) days. Said sums shall be paid directly to said Attorney Thomas O'Donnell.

Appellant's Br. pp. 28-42.

[15] Mother contends that the trial court abused its discretion in awarding primary physical custody of the Children to Father, determining child support, dividing the marital estate, valuing certain marital assets, and failing to address alleged provisional arrears owed by Father to Mother. Father contends that the trial court did not abuse its discretion in determining custody, dividing the marital estate, in finding his income to be $92,000 per year, or in declining to award $14,000 in maintenance pursuant to the provisional order. Father also cross-appeals, claiming that the trial court abused its discretion in ordering him to pay $25,000 in attorney's fees.

# Discussion and Decision

[16] Where, as happened here, the trial court *sua sponte* enters specific findings of fact and conclusions, we review its findings and conclusions to determine whether the evidence supports the findings, and whether the findings support

the judgment. *Fowler v. Perry*, 830 N.E.2d 97, 102 (Ind. Ct. App. 2005). We will set aside the trial court's findings and conclusions only if they are clearly erroneous. *Id*. A judgment is clearly erroneous when a review of the record leaves us with a firm conviction that a mistake was made. *Id*. We neither reweigh the evidence nor assess the witnesses' credibility, and consider only the evidence most favorable to the judgment. *Id*. Further, "findings made *sua sponte* control only … the issues they cover and a general judgment will control as to the issues upon which there are no findings. A general judgment entered with findings will be affirmed if it can be sustained on any legal theory supported by the evidence." *Id*.

# I. Custody

[17]     Mother contends that the trial court abused its discretion in awarding primary physical custody of the Children to Father, in light of his history of parental alienation.

> The court shall determine custody and enter a custody order in accordance with the best interests of the child. In determining the best interests of the child, there is no presumption favoring either parent. The court shall consider all relevant factors, including the following:
>     (1) The age and sex of the child.
>     (2) The wishes of the child's parent or parents.
>     (3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.
>     (4) The interaction and interrelationship of the child with:
>         (A) the child's parent or parents;
>         (B) the child's sibling; and

> (C) any other person who may significantly affect the
> child's best interests.
> (5) The child's adjustment to the child's:
>     (A) home;
>     (B) school; and
>     (C) community.
> (6) The mental and physical health of all individuals involved.
> (7) Evidence of a pattern of domestic or family violence by
> either parent.
> (8) Evidence that the child has been cared for by a de facto
> custodian, and if the evidence is sufficient, the court shall
> consider the factors described in section 8.5(b) of this chapter.

Ind. Code § 31-17-2-8.

> A child custody determination falls within the sound discretion
> of the trial court, and its determination will not be disturbed on
> appeal absent a showing of abuse of discretion. *In Re
> Guardianship of R.B.*, 619 N.E.2d 952, 955 (Ind. Ct. App. 1993).
> We are reluctant to reverse a trial court's determination
> concerning child custody unless the determination is clearly
> erroneous and contrary to the logic and effect of the evidence. *Id.*
> We do not reweigh evidence nor reassess witness credibility, and
> we consider only the evidence which supports the trial court's
> decision. *Wallin v. Wallin*, 668 N.E.2d 259, 261 (Ind. Ct. App.
> 1996).

*Spencer v. Spencer*, 684 N.E.2d 500, 501 (Ind. Ct. App. 1997).

[18] Mother challenges the trial court's finding that both she and Father are fit and proper persons to have custody of the Children. Mother argues that because of evidence that Father has engaged in a systematic pattern of parental alienation, a finding that he is a fit parent amounts to an abuse of discretion. We agree that the record supports the trial court's finding that Father has intentionally

and purposefully undermined the Children's relationship with Mother. However, and keeping in mind that we may only consider evidence that supports the trial court's judgment, the record also supports the finding that Mother's relationship with the Children—particularly A.B.—is so strained at this point that granting her primary physical custody would be "impossible."

[19] Dr. Warren Ugent, Psy.D., was asked by the parties to treat A.B. in May of 2014, and ultimately met with him approximately thirty times. Dr. Ugent opined that he did not believe that Father was telling A.B. what to say in counseling. A.B. told Dr. Ugent that Mother's affair with Jones had destroyed his "near perfect life." Tr. p. 676. Dr. Ugent testified that A.B. is adamant about not wanting to see or be with Mother. Dr. Ugent also opined that A.B.'s personality traits are one reason that he cannot yet forgive Mother.

[20] A.B. also cited alleged physical abuse of himself by Mother and pictures and statements posted on Facebook that A.B. found embarrassing. One example was a picture posted on Facebook of Mother standing behind Jones (who was dressed only in underpants), reaching around him, and placing her hand on his crotch. One of A.B.'s friends brought the picture to A.B.'s attention at school and teased him about it. A.B. indicated that he was devastated when he learned of Mother's pregnancy with Jones's child, believing that Mother no longer loved him. On October 4, 2014, Dr. Ugent sent a letter to the family's DCS case manager concerning A.B.'s reaction to Mother's pregnancy. Dr. Ugent noted that A.B. had expressed suicidal ideation with respect to visitation with Mother and recommended that "visitation be temporarily halted while he

takes time to process this devastating information [regarding Mother's pregnancy]." Appellee's App. p. 46. The record contains ample evidence to sustain a finding that, whatever the reason, reunification of A.B. with Mother is not a viable option at this time.

[21] Other than evidence related to parental alienation, Mother points to no evidence in the record to indicate that Father is an unfit parent, and it is abundantly clear that A.B. would prefer at this point to be with Father. It should also be noted that the trial court's disposition provides that she have visitation with B.B. pursuant to the Indiana Parenting Time Guidelines in addition to contemplating that her separation from A.B. be temporary. The trial court ordered the parties to continue therapy and counseling with the goal of reunification and normalization of A.B. and Mother's relationship. The trial court also ordered that A.B. have visitation with Mother at times deemed beneficial by the therapist or counselor guiding the reunification process. The trial court's order further provided that it would revisit the issue as the reunification process progressed. While we certainly do not condone any acts of parental alienation on Father's part, the record contains sufficient evidence to conclude that, so far as Mother is concerned, visitation with, or physical

custody of, the Children is not feasible at this point.  Mother has failed to establish that the trial court abused its discretion in this regard.[1]

## II.  Child Support

On review, "[a] trial court's calculation of child support is presumptively valid." *Young v. Young*, 891 N.E.2d 1045, 1047 (Ind. 2008) (citing *Kondamuri v. Kondamuri*, 852 N.E.2d 939, 949 (Ind. Ct. App. 2006)).  "[R]eversal of a trial court's child support order deviating from the appropriate guideline amount is merited only where the trial court's determination is clearly against the logic and effect of the facts and circumstances before the trial court." *Kinsey v. Kinsey*, 640 N.E.2d 42, 43 (Ind. 1994) (citing *Humphrey v. Woods*, 583 N.E.2d 133, 134 (Ind. 1991)).  Upon the review of a modification order, "only evidence and reasonable inferences favorable to the judgment are considered." *Kinsey*, 640 N.E.2d at 44 (string citation omitted).  The order will only be set aside if clearly erroneous. *Id.*

*Bogner v. Bogner*, 29 N.E.3d 733, 738 (Ind. 2015).

Mother contends that the trial court abused its discretion in finding that Father's income for both 2012 and 2013 was $92,048.00 for purposes of determining child support obligations.  For his part, Father argues that the trial court overestimated his income.  Mother relies primarily on evidence provided

---

[1] Mother has relied, in part, on our decision in *Kirk v. Kirk*, 759 N.E.2d 465 (Ind. Ct. App. 2001), a decision which was vacated by the Indiana Supreme Court in *Kirk v. Kirk*, 770 N.E.2d 304 (Ind. 2001).  Mother also draws our attention to our decision in *Maddux v. Maddux*, 40 N.E.3d 971 (Ind. Ct. App. 2015), in which we reversed the trial court's denial of a father's motion for change of custody where the mother had systematically denied and interfered with his parenting time and leveled several unfounded allegations of child abuse against him.  Unlike here, however, there is no indication in *Maddux* that mother's misconduct had influenced the child in question into despising his father, or that the child himself refused to see the father.

by William Condon, who performed a business analysis of Intercon Solutions. Condon testified that Father's 50% interest in Intercon Solutions was worth $1,725,806 on December 31, 2013, that Father should have been paid more for being Intercon Solutions CEO, and that various of Father's personal expenses were paid through Intercon Solutions. Condon testified that the yearly salary he would have paid Father for being CEO was either $224,000, $176,000, or $221,000. Condon also testified that Intercon Solutions made payments related to "expenses not germane to the business" of $682,000 in 2011, $754,000 in 2012, and $1,347,000 in 2013. Tr. p. 210. Condon testified that the expenses in question would have been typically added back to the shareholder's income. Father points to his testimony that at the time of the final hearing, he was unemployed and earning $580 in unemployment compensation from the State of Illinois.

[24] Two possible interpretations of the evidence above are that Father's income greatly exceeded $92,000 per year or that it was far less. The trial court, however, did not accept either of these interpretations. The trial court was free to consider and reject Condon's and/or Father's testimony regarding Father's income, and it did so. The trial court specifically found evidence regarding both parties' incomes to be "fairly indeterminate and contradictory as to what income should be attributed to each party" and chose to use the incomes reported by the parties on recent tax returns. Appellant's Br. p. 31. Because the trial court's findings regarding income are supported by evidence in the record, both Mother and Father have failed to establish an abuse of discretion. The

parties' arguments are an invitation to reweigh the evidence, which we will not do.

# III. Division of the Marital Estate

[25]     Mother contends that the trial court abused its discretion in failing to assign values to numerous marital assets and unequally dividing the marital estate. Indiana Code section 31-15-7-5 provides as follows:

> The court shall presume that an equal division of the marital property between the parties is just and reasonable. However, this presumption may be rebutted by a party who presents relevant evidence, including evidence concerning the following factors, that an equal division would not be just and reasonable:
> (1) The contribution of each spouse to the acquisition of the property, regardless of whether the contribution was income producing.
> (2) The extent to which the property was acquired by each spouse:
>     (A) before the marriage; or
>     (B) through inheritance or gift.
> (3) The economic circumstances of each spouse at the time the disposition of the property is to become effective, including the desirability of awarding the family residence or the right to dwell in the family residence for such periods as the court considers just to the spouse having custody of any children.
> (4) The conduct of the parties during the marriage as related to the disposition or dissipation of their property.
> (5) The earnings or earning ability of the parties as related to:
>     (A) a final division of property; and
>     (B) a final determination of the property rights of the parties.

# A. Assigning Value to Certain Marital Assets

[26] A trial court has broad discretion in valuing marital assets, and its valuation will only be disturbed for an abuse of that discretion. *Leonard v. Leonard*, 877 N.E.2d 896, 900 (Ind. Ct. App. 2007). A trial court does not abuse its discretion as long as sufficient evidence and reasonable inferences exist to support the valuation. *Id.* If the trial court's valuation is within the scope of the evidence, the result is not clearly against the logic and effect of the facts and reasonable inferences before the court. *See Skinner v. Skinner*, 644 N.E.2d 141, 144 (Ind. Ct. App. 1994). When determining the date upon which to value the marital assets, the trial court may select any date between the date of filing the dissolution petition and the date of the final hearing. *Deckard v. Deckard*, 841 N.E.2d 194, 200 (Ind. Ct. App. 2006) (citing *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996)).

*Webb v. Schleutker*, 891 N.E.2d 1144, 1151 (Ind. Ct. App. 2008). "A valuation submitted by one of the parties is competent evidence of the value of property in a dissolution action and may alone support the trial court's determination in that regard." *Houchens v. Boschert*, 758 N.E.2d 585, 590 (Ind. Ct. App. 2001) (citation omitted), *trans. denied*.

[27] Mother contends that the trial court abused its discretion in failing to include the proceeds, totaling $175,000, from the sale of a Lexus LFA automobile in the marital estate.[2] Father, however, testified that the Lexus LFA was owned

---

[2] While Mother contends that the trial court erroneously failed to assign values to numerous marital assets, Mother identifies only one asset by name, the Lexus LFA. Consequently, Mother has waived all claims regarding the other, unnamed assets. *See Johnson v. State,* 675 N.E.2d 678, 681 n.1 (Ind. 1996) (observing that the defendant failed to cite to the record and "[o]n review, this Court will not search the record to find grounds for reversal"); *Keller v. State,* 549 N.E.2d 372, 373 (Ind. 1990) (holding that a court which must

by Intercon Solutions and that the proceeds went back into the company's account in order to pay its bills. Mother's argument in this regard is another invitation to reweigh the evidence, which we will not do.

## B. Unequal Division

[28] Indiana Code section 31-15-7-5 provides as follows:

> The court shall presume that an equal division of the marital property between the parties is just and reasonable. However, this presumption may be rebutted by a party who presents relevant evidence, including evidence concerning the following factors, that an equal division would not be just and reasonable:
> (1) The contribution of each spouse to the acquisition of the property, regardless of whether the contribution was income producing.
> (2) The extent to which the property was acquired by each spouse:
>     (A) before the marriage; or
>     (B) through inheritance or gift.
> (3) The economic circumstances of each spouse at the time the disposition of the property is to become effective, including the desirability of awarding the family residence or the right to dwell in the family residence for such periods as the court considers just to the spouse having custody of any children.
> (4) The conduct of the parties during the marriage as related to the disposition or dissipation of their property.
> (5) The earnings or earning ability of the parties as related to:
>     (A) a final division of property; and

---

search the record and make up its own arguments because a party has presented them in perfunctory form runs the risk of being an advocate rather than an adjudicator); *Haddock v. State,* 800 N.E.2d 242, 245 n.5 (Ind. Ct. App. 2003) (noting that "we will not, on review, sift through the record to find a basis for a party's argument").

(B) a final determination of the property rights of the parties.

"Subject to the statutory presumption that an equal distribution of marital property is just and reasonable, the disposition of marital assets is committed to the sound discretion of the trial court." *Augspurger v. Hudson*, 802 N.E.2d 503, 512 (Ind. Ct. App. 2004).

> An abuse of discretion occurs if the trial court's decision is clearly against the logic and effect of the facts and circumstances, or the reasonable, probable, and actual deductions to be drawn therefrom. An abuse of discretion also occurs when the trial court misinterprets the law or disregards evidence of factors listed in the controlling statute. The presumption that a dissolution court correctly followed the law and made all the proper considerations in crafting its property distribution is one of the strongest presumptions applicable to our consideration on appeal. Thus, we will reverse a property distribution only if there is no rational basis for the award and, although the circumstances may have justified a different property distribution, we may not substitute our judgment for that of the dissolution court.

*Id*. (citations, quotation marks, and brackets omitted).

Mother argues that the trial court abused its discretion in ordering an unequal division of the marital estate without evidence to support such a division. Mother contends that the trial court erroneously awarded Father an approximate share of 65% of the marital estate, and, although Mother does not explain how she arrived at this figure, her argument seems to be based entirely on two assets that she contends were erroneously valued and/or assigned to Father: the proceeds from the sale of the Lexus LFA and Father's 50% interest

in Intercon Solutions. For his part, Father argues that the trial court erroneously overvalued his share in Intercon Solutions.

[31] As previously discussed, the trial court's decision not to include the proceeds from the sale of the Lexus LFA in the marital estate was supported by sufficient evidence. As for the value of Father's interest in Intercon Solutions, the trial court's findings indicate that Intercon Solutions was the only one of the parties' various business interests to which it felt it could assign a value based on the evidence presented. To that end, the only evidence the trial court identified was testimony that Intercon Solutions was valued at $2,200,000, Father owned a 50% share, and Father was liable for company debt of $823,511, which yields a value of $276,489. Based on this value for Intercon Solutions, the following table summarizes the trial court's division of the martial estate, including all assets that were found to have definite values and specifically designed to either party:

| Assets assigned to Father | | Assets assigned to Mother | |
|---|---|---|---|
| **Asset** | **Value** | **Asset** | **Value** |
| | | Marital Residence | $445,000.00 |
| Household goods (50%)[3] | $112,500.00 | Household goods (50%) | $112,500.00 |
| | | Lexus automobile | $42,000.00 |

---

[3] The trial court valued furniture, appliances and household goods located at the marital residence at $225,000 and assigned to each party those items already in possession. In the absence of any indication to the contrary, we assume an approximately equal division of this asset.

| | | | |
|---|---|---|---|
| TCF Bank checking account #5670 (50%) | $3,275.50 | TCF Bank checking account #5670 (50%) | $3,275.50 |
| TCF Bank savings account #2977 (50%) | $252.50 | TCF Bank savings account #2977 (50%) | $252.50 |
| American Express savings (50%) | $262.00 | American Express savings (50%) | $262.00 |
| Grow Financial FCU savings #3985-1 (50%) | $3.00 | Grow Financial FCU savings #3985-1 (50%) | $3.00 |
| Grow Financial FCU money market #3985-10 (50%) | $491.00 | Grow Financial FCU money market #3985-10 (50%) | $491.00 |
| Grow Financial FCU savings #5037-1 (50%) | $3.00 | Grow Financial FCU savings #5037-1 (50%) | $3.00 |
| Grown Financial FCU money market #5037-10 (50%) | $491.00 | Grown Financial FCU money market #5037-10 (50%) | $491.00 |
| TD Ameritrade, #5322 (50%) | $3,281.50 | TD Ameritrade, #5322 (50%) | $3,281.50 |
| New York Life whole life policy #8823 | $10,762.00 | | |
| New York Life whole life policy #0039 | $6,549.00 | | |
| | | Mother's jewelry collection | $1,000,000.00 |
| Father's jewelry collection | $344,003.00 | | |
| Intercom Solutions IRA #6692 (50%) | $53,338.50 | Intercom Solutions IRA #6692 (50%) | $53,338.50 |
| Interest in Intercon Solutions | $276,489.00 | | |
| **Totals** | **$811,701.00** | | **$1,660,898.00** |

[32] As can be seen, the trial court, if anything, divided the martial estate unequally in Mother's favor, not Father's. While both parties point to conflicting evidence to support their argument regarding the trial court's valuation of Intercon Solutions, the arguments are invitations to reweigh that evidence, which we will not do. Mother and Father have both failed to establish that the trial court abused its discretion in dividing the marital estate.

## IV. Provisional Maintenance

[33] It is not disputed that Father failed to pay fourteen monthly provisional maintenance payments of $1000 each. Mother contends that the trial court abused its discretion in not addressing this arrearage in the Decree. Father contends that a drastic change in circumstances between October of 2014 and the final hearing warranted elimination of his provisional maintenance obligation and that the trial court tacitly recognized this by failing to address the issue in the Decree.

> A provisional order is temporary in nature and terminates when the final dissolution decree is entered or the petition for dissolution is dismissed. Ind. Code §31-15-4-14. The determination of temporary orders in a dissolution proceeding is committed to the sound discretion of the trial court, and it can issue orders for temporary maintenance or support, temporary restraining orders, custody orders, and orders for possession of property to the extent it deems just and proper. Ind. Code §31-15-4-8; *Wendorf v. Wendorf*, 174 Ind. App. 172, 173, 366 N.E.2d 703, 704 (1977). On appeal, we will consider only the evidence most favorable to the trial court's decision. *In re Marriage of*

*McDonald,* 415 N.E.2d 75, 79 (Ind. Ct. App. 1981); *Wendorf,* 366 N.E.2d at 705. We will reverse only where the decision is clearly against the logic and effect of the facts and circumstances before the court. *McDonald*, 415 N.E.2d at 79; *Wendorf*, 366 N.E.2d at 705.

*Mosley v. Mosley*, 906 N.E.2d 928, 930 (Ind. Ct. App. 2009).

[34] Father argues that we should interpret the Decree's silence on the provisional maintenance question as a ruling by the trial court that circumstances had changed sufficiently to excuse Father from his obligation, retroactive to the fall of 2014. The record, in our view, is insufficient to allow us to adopt this interpretation. Quite simply, the trial court made no findings that even suggest it found a change in circumstances that would warrant relieving Father from his provisional maintenance obligation. Moreover, although it does not appear from the record that the parties argued the question in depth during the final hearing, Father does not argue that Mother has waived the issue.

[35] Although a provisional order terminates upon issuance of the dissolution order, *see* Ind. Code § 31-15-4-14, we have held that a trial court may order that an arrearage of provisional maintenance be satisfied upon dissolution. *See Crowley v. Crowley*, 708 N.E.2d 42, 57 (Ind. Ct. App. 1999), *overruled on other grounds by Bojrab v. Bojrab*, 810 N.E.2d 1008, 1014 n.3 (Ind. 2004) ("Because Mark failed to make the ordered mortgage payments, Laura lost the benefit of such payments for the several months leading up [to] the dissolution decree. The trial court was allowed to award her the benefit of the accrued payments upon dissolution. Thus, the trial court did not abuse its discretion in ordering

payment of the temporary maintenance arrearage."). Father points to no finding or conclusion that would support excusing his failure to comply with the trial court's provisional maintenance order. We remand with instructions to order Father to satisfy his $14,000 provisional maintenance arrearage.

# V. Attorney's Fees

[36] Father cross-appeals, contending that the trial court abused its discretion in ordering him to pay $25,000 in Mother's attorney's fees.

> Indiana Code section 31-15-10-1(a) authorizes the trial court to order a party to pay a reasonable amount for the cost to the other party of maintaining a dissolution proceeding. This includes the award of reasonable appellate attorney fees. *Beeson v. Christian*, 594 N.E.2d 441, 443 (Ind. 1992). Moreover, the trial court "enjoy[s] broad discretion in awarding allowances for attorney's fees. Reversal is proper only where the trial court's award is clearly against the logic and effect of the facts and circumstances before the court." *Selke v. Selke*, 600 N.E.2d 100, 102 (Ind. 1992). In other words, we review such awards only for an abuse of discretion. *Holman v. Holman*, 472 N.E.2d 1279, 1288 (Ind. Ct. App. 1985).
>
> ….
>
> While we recognize the trial court's "inherent authority to make allowances for attorney fees … in the interest of seeing that equity and justice is done on both sides[,]" *Crowe v. Crowe*, 247 Ind. 51, 211 N.E.2d 164, 167 (1965), the trial court "must consider the resources of the parties, their economic condition, the ability of the parties to engage in gainful employment and to earn adequate income, and such other factors as bear on the reasonableness of the award." *Barnett v. Barnett*, 447 N.E.2d 1172, 1176 (Ind. Ct. App. 1983).

*Bertholet v. Bertholet*, 725 N.E.2d 487, 501 (Ind. Ct. App. 2000) (first ellipsis added).

[37] In the Decree, Father was ordered to pay $25,000 directly to Mother's attorney, Thomas O'Donnell. Father notes that according to O'Donnell's affidavit of attorney's fees, Mother had incurred $41,950.21 in attorney's fees, and O'Donnell had been paid $31,000 against that obligation, presumably by Mother. O'Donnell is, at most, personally owed a balance of $10,950.21. Consequently, direct payment to O'Donnell of $25,000 represents a significant overpayment, for which the trial court gave no reasons. We conclude that the order of direct payment of the entire sum of $25,000 to O'Donnell represents an abuse of discretion.

[38] That said, the overall award of $25,000 does not represent an abuse of discretion because the trial court made several findings supporting an order reimbursing Mother for payments she presumably has already made to O'Donnell. As for the parties' respective financial situations, the trial court found that Father's yearly income was $92,000 and Mother's was $50,000 and noted that while Father claimed that Intercon Solutions was insolvent, Father had already incorporated a new company doing the same work for the former clients of Intercon Solutions. Moreover, Father emerges from the dissolution proceeding with several hundred thousand dollars in assets, and so is well able to afford a $25,000 payment of attorney's fees. Finally, the trial court made several findings pointing to misconduct on Father's part that would also support an award of attorney's fees, including that Father (1) was less than

credible on numerous points, (2) appears to be an accomplished manipulator, (3) has engaged in questionable and possibly illegal practices resulting in the diversion of Intercon Solutions to himself, (4) has negatively influenced the Children, and (5) dissipated significant marital assets. Under the circumstances, we cannot conclude that the trial court abused its discretion in awarding $25,000 in attorney's fees to Mother. We remand with instructions that Father be ordered to pay $10,950.21 to O'Donnell and $14,049.79 to Mother for a total of $25,000 in attorney's fees.

## Conclusion

[39] We conclude that the trial court did not abuse its discretion in awarding primary physical custody of the Children to Father, in calculating child support, or in dividing the martial estate. As such, we affirm those portions of the Decree. Moreover, we remand with instructions to order Father to satisfy his $14,000 provisional maintenance arrearage. Finally, we conclude that the trial court did abuse its discretion in ordering Father to pay all $25,000 in attorney's fees directly to O'Donnell and so remand with instructions to pay $10,950.21 to O'Donnell and $14,049.79 to Mother.

[40] The judgment of the trial court is affirmed in part and reversed in part, and we remand with instructions.

Pyle, J., and Altice, J., concur.